# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

STEVEN BROOKS and DAVID CHAVEZ, individually, and on behalf of all others similarly situated,

          Plaintiffs,

          v.

COMMONWEALTH EDISON COMPANY d/b/a ComEd and EXELON CORPORATION,

          Defendants.

Case No.:

CLASS ACTION COMPLANT

JURY TRIAL DEMANDED

Jonathan D. Selbin
Rachel J. Geman
Jason L. Lichtman
John T. Nicolaou
**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
212.355.9500

Kevin R. Budner
**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
275 Battery Street
San Francisco, CA 94111
415.956.1000

Andrew R. Kaufman
**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
222 Second Avenue South, Suite 1640
Nashville, TN 37201
615.313.9000

Laurel G. Bellows
**The Bellows Law Group, P.C.**
209 South LaSalle, Suite 800
Chicago, IL 60604
312.332.3340

Gary M. Klinger
**Mason, Lietz & Klinger, LLP**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
202.975.0477

# CLASS ACTION COMPLAINT

1.       This is a case about a corrupt scheme that caused millions of Illinois residents to pay dramatically inflated rates for electricity. As revealed in a Deferred Prosecution Agreement between Defendant Commonwealth Edison Company ("ComEd") and the United States Department of Justice, ComEd paid bribes over many years to Michael A. Madigan, the powerful Speaker of the Illinois House of Representatives. In exchange, Madigan ensured passage through the Illinois legislature of bills permitting ComEd to charge higher electric rates. ComEd, Defendant Exelon Corporation (ComEd's corporate parent), and Madigan were the winners in this scheme. The losers? Public trust in government, the people of Illinois, and, most pertinent here, ComEd's customers.

2.       The scheme was part of a longstanding "pay to play" enterprise headed by Madigan, involving his network of loyalists as well as Defendants and their individual employees and representatives. The modus operandi of Madigan's enterprise was simple: Madigan demanded money or "favors," Defendants so complied, and in exchange Defendants received Madigan's support for legislation favoring their economic interests. That support was crucial: no bill moves in the Illinois House without Madigan's support.

3.       In this case, and as admitted in the Deferred Prosecution Agreement, ComEd hired Madigan's associates as "subcontractors," who were paid well (to the tune of more than $1.3 million) for little or no work, appointed another associate to its board of directors (without interviewing or even considering other candidates), and retained a particular law firm "with the intent to influence and reward" Madigan. ComEd concealed its illegal payments using off-the-books payment records and fraudulent invoices.

4.       The bribes to Madigan paid off handsomely for ComEd. Under Madigan's stewardship, the Illinois legislature passed two bills in 2011 and 2016—the Energy Infrastructure

1

and Modernization Act ("EIMA") and the Future Energy Jobs Act ("FEJA")—each of which permitted ComEd to charge dramatically higher rates for electricity. Some 70% of Illinois residents, (individuals and businesses), including Plaintiffs, who buy electricity from ComEd, paid out of pocket for these rate increases.

5. The central allegations in this case are as indisputable as they are shocking.[1] Many of the essential facts are laid bare—admitted by ComEd—in the Deferred Prosecution Agreement. Lest there be any doubt, Defendants' corrupt intent is proven by their efforts to obfuscate the truth. And the harm to Plaintiffs and the proposed Class is real: *to date*, *they paid approximately $1.64 billion in increased electricity rates under legislation that never would have passed but for Defendants' corrupt scheme.*

6. The facts of this case are extraordinary, but the basic claims for relief are not. As a result of their bribery campaign, Defendants obtained money at Plaintiff's and the proposed Class's expense. Under straightforward application of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, as well as Illinois statutory and common law, Defendants must repay their wrongfully-obtained windfall.

## PARTIES

### A. Plaintiffs

7. Steven Brooks is a citizen of the State of Illinois residing in the City of Lombard, County of DuPage. At all relevant times, Brooks was a residential customer of ComEd who, in turn, provided electricity to Brooks' home.

---

[1] All allegations in this compliant are based on Plaintiffs' personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

8.     David Chavez is a citizen of the State of Illinois residing in the City of Northlake, County of Cook. At all relevant times, Chavez was a residential customer of ComEd who, in turn, provided electricity to Chavez's home.

**B.     Defendants**

9.     Defendant Commonwealth Edison Company is an Illinois corporation with its principal place of business located at 440 South LaSalle Street, Chicago, Cook County, Illinois, 60605. ComEd is an electric utility provider that conducts substantial business throughout this District and the State of Illinois. ComEd is a subsidiary of Defendant Exelon and a public utility regulated by the Illinois Commerce Commission ("ICC") pursuant to the Illinois Public Utility Act, 220 ILCS 5/3-105; 220 ILCS 5/1-102, *et seq*.

10.     Defendant Exelon Corporation is a Pennsylvania corporation with its principal place of business located at 10 S. Dearborn Street, 49th Floor, Chicago, Cook County, Illinois, 60603. Exelon is a Fortune 100 energy company that conducts substantial business throughout this District and the State of Illinois. Exelon generates revenues of approximately $33.5 billion and is the largest electric parent company in the United States by revenue, the largest regulated electric utility in the United States, and the largest operator of nuclear power plants in the United States.

## JURISDICTION AND VENUE

11.     This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because the Plaintiffs assert claims under the RICO, 18 U.S.C. § 1961, *et seq*.

12.     This Court has supplemental subject matter jurisdiction over the state-law claims in this action pursuant to 28 U.S.C. § 1367.

13. Personal jurisdiction over Defendants is proper because they transact business in the State of Illinois, each have a principal place of business in Illinois, and a substantial number of the events giving rise to the claims alleged herein took place in Illinois.

14. Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, acts or omissions giving rise to the claims occurred in this judicial District.

## FACTS

### A.    Defendants and third-party co-conspirators formed a corrupt association-in-fact enterprise.

15. For an unknown number of years including at least the time period between 2011 and the present, Madigan led an association-in-fact enterprise consisting of his staff, ComEd/Exelon, their lobbyists and law firm, and other individuals and corporate entities with the shared goal of exploiting the democratic legislative process for their own gain. The victims of this prolonged scheme are Plaintiffs and the proposed Class of similarly-situated utility customers injured by the rate increases unlawfully obtained by the acts of the enterprise.

16. The below facts demonstrate in detail that Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"). As explained in Count I below, a RICO conspiracy requires proof that (1) the defendant[s] agreed to participate in the affairs of an association-in-fact enterprise through a pattern of racketeering activity, and (2) the defendant[s] further agreed that someone would commit at least two predicate acts to accomplish these goals. At a high level, and as shown in this statement of facts:

17. The enterprise consisted of at least the following individuals and entities:[2]

---

[2] Although Plaintiffs cannot identify all the participants in Madigan's corrupt enterprise without discovery of information possessed by Defendants and other participants, Plaintiffs describe with particularity several key members of the enterprise below, as well as their distinct roles and hierarchical positions in the enterprise.

a.  Madigan's network of loyal allies: Michael McClain,[3] Edward Moody, Frank Olivo Jr., Michael Zalewski, and Juan Ocho; and

b.  Defendants ComEd and Exelon and their employees and representatives: Anne Pramaggiore, the former CEO of ComEd and Exelon Utilities (a division of Exelon); John Hooker, ComEd's former executive vice president of legislative and external affairs; Fidel Marquez, ComEd's former Senior Vice President, Governmental and External Affairs; Jay Doherty, ComEd's lobbyist; and his company, Jay D. Doherty & Associates.

18.   The pattern of racketeering activity is the solicitation (by Madigan and his allies), payment (by Defendants), and receipt (by Madigan and his allies) of dozens of bribes between 2011 and 2019, and the misleading use of mail and/or wire to conceal those bribes. Defendants' purpose in making these bribes was to obtain favorable state utility legislation that enable it raise utility rates. The criminal statutes implicated by Defendants' racketeering are 720 Ill. Comp. Stat. Ann. 5/33-1 & 33-3 (bribery and official misconduct) and 18 U.S.C. §§1341, 1343 (mail and wire fraud).

19.   The enterprise is separate from the pattern of racketeering activity and its members because it involved members working toward the shared goal of further their self-interest in connection with state utility legislation, and some of the enterprise's activities (such as political donations without a quid pro quo) may have been legal and not in violation of RICO. Defendants' bribes, of course, were not legal.

---

[3] As explained more fully below, McClain played a dual role for both Madigan and Defendants.

20.     The enterprise is also separate from its members because each member is an individual or corporate entity with an autonomous existence, and would survive the dissolution of the enterprise.

21.     With respect to conspiracy, the Defendants' agreement to participate in the enterprise though a pattern of racketeering is confirmed in ComEd's Deferred Prosecution Agreement, which admits facts confirming their knowing participation in bribery and mail and/or wire fraud. There are dozens of predicate acts, far in excess of the required two.

22.     The RICO activity caused injuries to Plaintiffs and the Class because Defendants' bribes secured favorable legislation that allowed it dramatically increase rates it charged customers.

23.     In practice, the enterprise had a simple modus operandi: Madigan repeatedly delivered demands for favors through his network of allies (often former Democratic public officials or campaign workers) to ComEd and Exelon, who desired Madigan's assistance with favorable state utility legislation. These demands often involved requests that ComEd and/or Exelon provide jobs or contracts with income streams to Madigan's associates without meaningful economic justification. Madigan procured these favors to economically reward his associates for their years of service and thereby consolidate his power base by encouraging future loyalty and/or political donations from the recipients and other allies. In exchange, ComEd and Exelon received benefits in the form of Madigan's support for legislation that furthered their economic interests.

### 1.     Michael Madigan

24.     Michael Madigan has been a member of the Illinois House of Representatives since 1971. He still holds this office, making him its longest tenured member.

25.     Madigan has been the 13th Ward Democratic committeeman since 1969. The 13th Ward is one of fifty regions that elect representatives (called "aldermen") to the Chicago City Council, which is the legislative branch of the government of the City of Chicago. As committeeman of the 13th Ward, Madigan oversees the Democratic party's local political efforts, including precinct voter registration, voter turnout efforts, community forums, distribution of election materials, and election operations.

26.     He was Speaker of the Illinois House of Representatives between 1983 and 1995 and between 1997 and the present.

27.     He is the longest-serving leader of any state or federal legislative body in the history of the United States.

28.     Madigan has been chairman of the Illinois Democratic Party since 1998.

29.     Madigan was the leader of the association-in-fact enterprise that harmed Plaintiffs and the proposed Class of similarly-situated utility customers. Madigan's leadership position stemmed from his extraordinary power as the Speaker of the House, described more fully below. This position enabled him to induce corporations to offer substantial benefits in exchange for favorable legislation.

30.     As leader, Madigan rarely made direct demands for favors. Instead, he typically delivered his demands through trusted associates. As explained more fully below, however, the participants in the enterprise consistently acknowledged that Madigan was the source of various demands for favors and that they were acting at Madigan's behest.

31.     Madigan's enterprise closely resembles a patronage system (sometimes called a spoils system), whereby a political party, after winning an election, gives government civil service jobs to its supporters, friends, and relatives as a reward for working toward victory, and

as an incentive to keep working for the party. Patronage systems like Madigan's enterprise have a long and sordid history in Chicago. At most, Madigan's enterprise is a slight variation on the patronage systems insofar as Madigan also uses his position to obtain private sector jobs for his supporters, friends, and relatives instead of strictly offering civil service jobs.

32. Madigan is the classic patron. Several of Madigan's associates explicitly describe him as a "father" or "mentor."

33. Madigan previously acknowledged his knowing participation in patronage systems. In 2009, he stated as part of an oral history of the late Chicago mayor Richard Daley: "[I]n those days, when I became the ward committeeman, that was the biggest thing around . . . . I mean, everybody wanted to be a ward committeeman. They knew the power of the patronage system. . . . They wanted a job in the patronage system . . . . I would tell them, 'Yes, we can put you in a job. But you're going to work for the Democratic Party.'"

34. ComEd's Deferred Prosecution Agreement refers to Madigan as "Public Official A."

35. A federal grand jury served Madigan with a subpoena for documents in July 2020.

### 2. Madigan's trusted associates

36. Madigan's associates operated as the arms of his enterprise. They delivered his messages and carried out his orders in the field when dealing with companies seeking favorable legislation. Several key examples of these associates are identified below.

#### a. Michael McClain a.k.a. Individual A

37. Michael McClain performed "lobbying" and "political consulting" services for ComEd for many years, at least spanning the time period between 2011 and until the spring of 2019. He was reportedly the point man in the discussions about major ComEd and Exelon legislation for decades.

38.     At the same time, McClain served as one of Madigan's longest-tenured and most loyal associates.

39.     McClain was a member of the Illinois House of Representatives between 1972 and 1982.

40.     In 1981, Madigan was the House minority leader and picked McClain to be assistant minority leader.

41.     Madigan's chief of staff Tim Mapes reportedly stated in an email to McClain that Madigan was McClain's "number one client," even though McClain was under contract with and received payments from companies that lobby Madigan, including ComEd.

42.     In 2016, McClain reportedly remarked to Mapes in another email that Madigan, Madigan's wife, and his family were "intertwined" with McClain and his family.

43.     Other emails reportedly show that McClain was allowed to offer edits on Madigan's inaugural addresses. This disturbing level of involvement for an outside lobbyist again confirms Madigan's close ties to McClain.

44.     Madigan has publicly praised McClain. For example, in 2016, Madigan was quoted by the *Quincy Herald-Whig* newspaper as saying McClain "had an outstanding career as a legislator and a lobbyist, operating with complete honesty and integrity" and "should be seen locally as a great credit to Quincy and Adams County." These statements further confirm his close ties with McClain.

45.     In 2019, federal authorities raided McClain's home for evidence, apparently in connection with the investigation leading to ComEd's Deferred Prosecution Agreement. *The Chicago Tribune* also reported in 2019 that federal authorities had tapped McClain's phone line.

46.     McClain's role in Madigan's enterprise was primarily to serve as a trusted line of communication between Madigan on the one hand and corporate participants on the other. He performed this role for ComEd and Exelon and, upon information and belief, for other corporate participants in Madigan's enterprise.

47.     The federal grand jury subpoena served upon Madigan in July 2020 seeks Madigan's communications with McClain.

48.     ComEd's Deferred Prosecution Agreement refers to McClain as "Individual A."

**b.     Edward Moody a.k.a. Associate 1**

49.     Edward Moody has been the Cook County recorder of deeds since December 2018. Prior to that, Moody served as the Worth Township Highway Commissioner and 6th District Cook County Commissioner.

50.     Moody is a longtime supporter of Madigan and Illinois Democratic party worker in Madigan's 13th Ward. As a teenager, Moody began working for Madigan by knocking on doors for Madigan's campaigns. Moody first became a Democratic precinct captain in 1988. He served as a precinct captain for Madigan's 13th Ward in 1991 and for at least 25 years thereafter. According to reporting in *The Chicago Sun-Times*, Moody considered Madigan to be a father figure.

51.     Moody served Madigan and the Illinois Democratic Party for many prior years. Madigan, in turn, rewarded him with economic benefits in the form of payments from ComEd, described in more detail below.

52.     Upon information and belief, ComEd's Deferred Prosecution Agreement refers to Moody as "Associate 1."

53.     The federal grand jury subpoena served upon Madigan in July 2020 seeks documents relating to Moody's business relationship with ComEd or Exelon.

### c.  Frank Olivo Jr. a.k.a. Associate 2

54.     Frank Olivo Jr. served as alderman of the City of Chicago 13th Ward from 1994 until he retired in 2011.

55.     Olivo was reportedly a protégé of Madigan. In 2006, he was quoted in *The Chicago Tribune* as describing Madigan as "a neighbor, a friend." The same article described Madigan as Olivo's "mentor."

56.     Olivo has deep ties to Madigan's Democratic committee for the 13th Ward and Madigan himself. In or around the late 1960s, he became a precinct captain there at the age of 18. Olivo previously was the 13th Ward's Streets and Sanitation superintendent. He was also alderman for the 13th Ward between 1994 and 2011, and in that capacity represented the 13th Ward on the Chicago City Council. Madigan reportedly helped get Olivo nominated by the mayor in 1994 to replace the ward's alderman. Olivo and Madigan's 13th Ward offices were next to each other at 6500 S. Pulaski.

57.     Shortly after leaving office in 2011, Olivo began receiving payments from ComEd, purportedly for services as a lobbyist. He has reportedly received such payments until sometime in 2019.

58.     Olivo served Madigan and the Illinois Democratic Party for many prior years. Madigan, in turn, rewarded him with economic benefits in the form of payments from ComEd, described in more detail below.

59.     Upon information and belief, ComEd's Deferred Prosecution Agreement refers to Olivo as Associate 2.

60.     The federal grand jury subpoena served upon Madigan in July 2020 seeks documents relating to Olivo's business relationship with ComEd or Exelon.

#### d.   Michael Zalewski a.k.a. Associate 3

61.    Michael R. Zalewski is a longtime member of the Illinois Democratic party. He was alderman of the 23rd ward of the City of Chicago from May 1995 to his retirement on May 31, 2018.

62.    Zalewski's family has significant political power relevant to ComEd's and Exelon's business. His son, Michael J. Zalewski, is a state representative. His daughter-in-law, Carrie Zalewski, is chair of the ICC, ComEd's regulator.

63.    Zalewski owns a consulting company called The Z Consulting Group, Inc.

64.    Federal authorities searched Zalewski's home in May 2019.

65.    Zalewski served Madigan and the Illinois Democratic Party for many prior years. Madigan, in turn, rewarded him with economic benefits in the form of payments from ComEd, described in more detail below.

66.    ComEd's Deferred Prosecution Agreement refers to Zalewski as "Associate 3."

67.    The federal grand jury subpoena served upon Madigan in July 2020 seeks Madigan's documents relating to Zalewski and The Z Consulting Group, Inc.

#### e.   Juan Ochoa a.k.a. Board Member 1

68.    Juan Ochoa is CEO of the Miramar Group, an international facilities management firm. Ochoa has occupied this role since 2010. He has also served as a special advisor to Chicago Mayor Rahm Emanuel, another powerful politician in the Illinois Democratic party.

69.    Ochoa served as the head of the Metropolitan Pier and Exposition Authority between 2007 and 2010. Ochoa was reappointed to the board of the Authority in 2017.

70.    Ochoa has publicly admitted that he has carried out Madigan's bidding in the past at least in part due to Madigan's political power. A 2014 *Chicago Tribune* article states: "Juan Ochoa . . . said Madigan called him to request a raise for Sherry Brticevich, the daughter of a

former state senator from Madigan's Southwest Side neighborhood. 'He made a point to say this was a favor for someone very close to him,' Ochoa said. Ochoa said Brticevich was a hard worker who deserved the raise she received after Madigan's call. 'I didn't feel like he was putting a gun to me but, then again, he is the speaker of the House,' Ochoa said. 'This was someone who is important to the speaker of the House, who to a great extent controlled our legislation and funding.'"

71.     Ochoa was a member of ComEd's board of directors between April 2019 and April 2020. The timing of his resignation indicates that he resigned due to the Government investigation that led to ComEd's Deferred Prosecution Agreement.

72.     Ochoa served the Illinois Democratic Party for many prior years. Madigan, in turn, rewarded him with economic benefits in the form of payments from ComEd and a prestigious position with ComEd, described in more detail below.

73.     ComEd's Deferred Prosecution Agreement refers to Ochoa as "Board Member 1."

74.     The federal grand jury subpoena served upon Madigan in July 2020 seeks Madigan's documents relating to Ochoa.

###### f.      Victor Reyes a.k.a. Attorney 1

75.     Victor Reyes is an attorney based in Chicago. Upon information and belief, he is a partner and/or owner of the law firm Reyes Kurson and the lobbying firm The Roosevelt Group.

76.     Reyes is a significant political donor for the Democratic Party. *The Prairie State Wire* reports that Reyes has donated $107,627 to two funds controlled by Madigan: the Democratic Party of Illinois and Friends of Michael Madigan. The same article reports Reyes has made $920,452 in political donations since 2005, 96% of which went to the Democratic Party.

77.    Reyes donated money to the Illinois Democratic Party and Madigan. Madigan, in turn, rewarded him with economic benefits in the form of payments from ComEd, described in more detail below.

78.    The federal grand jury subpoena served upon Madigan in July 2020 seeks documents relating to Reyes, Reyes Kurson, and The Roosevelt Group.

79.    Upon information and belief, ComEd's Deferred Prosecution Agreement refers to Reyes as "Lawyer A" and Reyes Kurson as "Law Firm A."

### 3.    ComEd, Exelon, and Their Employees and Representatives

80.    Corporate participants join Madigan's enterprise on a largely transactional basis. They involve themselves with Madigan and his associates for the purpose of obtaining favorable legislation that benefits their business. To do so, however, they must "play ball"—i.e., knowingly participate in the corrupt acts of the enterprise by providing financial rewards in the form of unearned jobs and income to Madigan's associates in exchange for the favorable legislation they seek.

81.    Exelon and ComEd have participated in Madigan's enterprise in this manner for many years, spanning at least the time period between 2011 and 2019. ComEd's Deferred Prosecution Agreement admits ComEd's motive to affect legislation: "As a utility, ComEd is subject to extensive regulation by the State of Illinois. The State of Illinois regulates the rates that ComEd may charge its customers, as well as the rate of return ComEd may realize from its business operations. The legislative branch of the State of Illinois, known as the Illinois General Assembly, has routinely considered bills and has passed legislation that has had a substantial impact on ComEd's operations and profitability, including legislation that affects the regulatory process ComEd uses to determine the rates ComEd charges its customers for the delivery of

electricity. In order for legislation to become law, it must be passed by both houses of the Illinois General Assembly—the Illinois House of Representatives and the Illinois Senate."

82.     Because corporations like Exelon and ComEd cannot act without the involvement of their individual representatives, several individual employees and representatives of Exelon and ComEd have participated in Madigan's enterprise in the same manner. Several of these individuals are described in more detail in this subsection.

### a.     John Hooker a.k.a. Lobbyist 1

83.     John Hooker was an employee of ComEd for 44 years. In 2012, he retired as executive vice president of legislative and external affairs. After retiring in 2012 until 2019, he continued to lobby for the utility, working for outside firms with McClain and later Michael Kasper, a longtime attorney for Madigan's office as well as the Illinois Democratic Party.

84.     Hooker also served as the chairman of the Chicago Housing Authority Board between 2015 and 2019. He resigned from this position on July 17, 2020—the same day that ComEd's Deferred Prosecution Agreement was publicly revealed.

85.     In 2016, Hooker filed a lawsuit to block a legislative redistricting proposal that threatened Madigan's grip on political power.

86.     ComEd's Deferred Prosecution Agreement refers to Hooker as "Lobbyist 1."

### b.     Anne Pramaggiore a.k.a. CEO-1

87.     Anne Pramaggiore was the chief executive officer of ComEd between in and around March 2012 and May 2018.

88.     From June 1, 2018 to October 15, 2019, Pramaggiore served as a senior executive at Exelon, and had oversight authority over ComEd's operations. The timing of Pramaggiore's resignation suggests she resigned because of the federal investigation that led to ComEd's Deferred Prosecution Agreement.

89.     Pramaggiore's role in the enterprise was to effectuate ComEd's and Exelon's participation by complying with Madigan's demands as rewards for Madigan ensuring the passage of valuable utility legislation.

90.     ComEd's Deferred Prosecution Agreement refers to Pramaggiore as "CEO-1."

### c.     Fidel Marquez a.k.a. Senior Executive 1

91.     Fidel Marquez was ComEd's senior vice president for legislative and external affairs from in or around March 2012 until in or around September 2019. He was a ComEd employee for nearly 40 years.

92.     The timing of Marquez's resignation suggests he resigned because of the federal investigation that led to ComEd's Deferred Prosecution Agreement.

93.     Marquez's role in the enterprise was to effectuate ComEd's and Exelon's participation by complying with Madigan's demands as rewards for Madigan ensuring the passage of valuable utility legislation.

94.     ComEd's Deferred Prosecution Agreement refers to Marquez as "Senior Executive 1."

### d.     Jay Doherty a.k.a. Consultant 1

95.     Jay Doherty is a lobbyist and owner of a company named Jay D. Doherty & Associates.

96.     For several years (including the time period between 2011 and 2019), Doherty was a lobbyist for ComEd. Doherty's work for ComEd ceased in the fall of 2019. Upon information and belief, the federal investigation that led to ComEd's Deferred Prosecution Agreement is the reason for this development.

97.     Doherty was President of the City Club of Chicago for 27 years. The City Club is an influential public forum. Its website touts this quote from *The New York Times*: "The City

Club of Chicago, a who's who of business people and political leaders and a required stop for most anyone who wants to win office around here." Doherty resigned his presidency of the City Club in 2019, shortly after he ceased lobbying for ComEd. Upon information and belief, the federal investigation that led to ComEd's Deferred Prosecution Agreement is also the reason for this development.

98.     ComEd reportedly paid Jay D. Doherty & Associates $3.1 million between 2011 and 2018.

99.     In May of 2019, federal authorities reportedly raided the City Club of Chicago for Doherty's documents.

100.    The federal grand jury subpoena served upon Madigan in July 2020 seeks Madigan's communications with Doherty.

101.    ComEd's Deferred Prosecution Agreement refers to Doherty as "Consultant 1" and Jay D. Doherty & Associates and "Company 1."

102.    As explained more fully below, Doherty's role in the enterprise was to use Jay D. Doherty & Associates as a pass-through vehicle for ComEd's payments to Madigan's associates. Doherty was an agent of ComEd charged with implementing transactions with Madigan and his associates and concealing them from discovery.

### 4.     Madigan's enterprise existed separately from its members and from their criminal activities.

103.    The members of Madigan's enterprise have a separate existence from the enterprise itself. The individuals, for example, each have their own positions in public and private institutions. The corporate participants likewise have corporate structures and lines of business that can continue to exist outside the enterprise, albeit less profitably. Each of the participants can and would continue to exist autonomously if the enterprise collapsed.

**B.    Defendants engaged in a pattern of racketeering.**

104.    Between 2011 and 2019, Defendants bribed Madigan and other members of his political organization dozens of time. Defendants' bribes included jobs, contracts, and money to Madigan's associates which had a dual effect of enriching Madigan's associates and consolidating Madigan's power over his patronage system. Specifically:

> a.    ComEd paid more than $1 million in bribes from 2011 to 2019 to three Madigan's loyal associates Moody, Olivo, and Zalewski[4] for little to no work;
>
> b.    ComEd contracted with and paid unjustified fees to Reyes Kurson, a law firm that donated more than $100,000 to funds controlled by Madigan and nearly $1 million to the Democratic Party; And
>
> c.    ComEd and Exelon appointed Madigan ally Ochoa to its board of directors.

105.    For each bribe, Defendants acted on a request by Madigan, almost invariably delivered by Madigan's lieutenant McClain, who was working as a ComEd lobbyist.

106.    Defendants and their co-conspirators also committed mail and/or wire fraud to conceal their bribes from public scrutiny.

> **1.    To secure Madigan's support for EIMA in 2011, ComEd bribed Madigan by agreeing to Madigan's demands that ComEd pay his associates.**

107.    In or around 2011, Madigan and his lieutenant McClain sought to obtain from ComEd jobs, vendor subcontracts, and monetary payments associated with jobs and subcontracts for various associates of Madigan. The recipients of these payments were former precinct

---

[4] As explained more fully below, ComEd made these payments using Doherty and Jay D. Doherty & Associates as a pass-through vehicle.

captains for Madigan's legislative district who, according to *The New York Times*, "helped Mr. Madigan stay elected in his district on Chicago's Southwest Side."[5] At the time, these precinct captains—Frank Olivo and Ed Moody—had deep ties to Madigan's Democratic Committee for the 13th Ward dating back 40 and 20 years, respectively, and served as Madigan's lieutenants for his party's local voter turnout efforts.

108.    In or around 2011, McClain and then ComEd executive vice president of legislative and external affairs John Hooker developed a plan to direct money to two of Madigan's low-level associates, Olivo and Moody, by having ComEd pay them indirectly as subcontractors to ComEd consultant Doherty and his company, Jay D. Doherty & Associates. Upon information and belief, this plan was implemented in 2011.

109.    In or around 2011, ComEd agreed to retain law firm Reyes Kurson, and entered into a contract pursuant to which ComEd agreed to provide Reyes Kurson with a minimum of 850 hours of attorney work per year. ComEd entered into this contract with Reyes Kurson, in part, with the intent to influence and reward Madigan in connection with Madigan's official duties and because personnel and agents of ComEd understood that giving this contract to Reyes Kurson was important to Madigan.

110.    While ComEd made these bribes in 2011, the Illinois legislative bodies considered EIMA, a bill of critical importance to ComEd. The EIMA was passed by the Illinois House of Representatives in or around May 2011, and by the Illinois Senate in or around August 2011. EIMA was then vetoed by the Governor of the State of Illinois. Thereafter, in or around October 2011, both houses of the Illinois General Assembly voted to override the Governor's veto.

---

[5] https://www.nytimes.com/2020/07/17/us/illinois-michael-madigan.html

### 2. To garner support from Madigan, ComEd continued to pay Madigan's associates for little to no work from 2011 until 2019.

111.    From 2011 until in or around 2019, ComEd continued to make payments to Olivo and Moody through Doherty and Jay D. Doherty & Associates for little or no work. During this time, ComEd also made payments to other subcontracted associates of Madigan for little or no work. Doherty and Jay D. Doherty & Associates did little, if anything, to direct or supervise the activities of Madigan's associates, even though they were subcontracted under and received payments through Jay D. Doherty & Associates.

112.    In or around May 2018, Madigan, through his lieutenant McClain, asked senior executive vice president and CEO of Exelon Utilities, Anne Pramaggiore to hire Michael Zalewski, a political ally of Madigan who was retiring from the Chicago City Council at the end of the month. Pramaggiore, in coordination with ComEd senior vice president for legislative and external affairs Fidel Marquez and ComEd consultant Jay Doherty, agreed that ComEd would pay Zalewski approximately $5,000 a month indirectly as a subcontractor through Jay D. Doherty & Associates. At the time Pramaggiore approved this arrangement, she was aware that there were other associates of Madigan that were paid indirectly as subcontractors through Jay D. Doherty & Associates. She referred to these associates as the "roster." She also agreed that Madigan—rather than an officer or employee of ComEd or Jay D. Doherty & Associates— would advise Zalewski of this new arrangement.

113.    In or around June 2018, Jay D. Doherty & Associates' contract with ComEd was revised to include extra funding for the purpose of paying Zalewski. In seeking to justify the extra funding, Doherty claimed that an additional fee of $5,000 a month was necessary under the contract, in part because of Jay D. Doherty & Associates' "expanded role with Cook County Board president's office and Cook County Commissioners and Department Heads," when in fact

the additional $5,000 a month in compensation was intended for payment to Zalewski. ComEd approved of the additional payments to Jay D. Doherty & Associates, knowing they were intended for Zalewski.

114. Senior executives and agents of ComEd, as well as other co-conspirators, were aware of the purpose of ComEd's payments to Madigan's associates, namely, that they were intended to influence and reward Madigan in connection with Madigan's official duties and to advance ComEd's business interests. For example:

    a.    On or about May 16, 2018, Madigan's lieutenant McClain explained to ComEd senior vice president for legislative and external affairs Fidel Marquez why certain individuals were being paid indirectly through Jay D. Doherty & Associates, by making reference to their utility to Madigan's political operation. McClain identified Moody, one of the several individuals on Jay D. Doherty & Associates' payroll, as "one of the top three precinct captains" who also "trains people how to go door to door . . . so just to give you an idea how important the guy is."

    b.    On or about February 7, 2019, McClain advised Marquez about how to present information within ComEd concerning the renewal of Jay D. Doherty & Associates' contract for 2019. In the conversation, McClain advised Marquez that, "I would say to you don't put anything in writing," explaining later in the conversation because "all it can do is hurt ya." McClain further advised Marquez that, if asked by a ComEd official why Jay D. Doherty & Associates was being paid, Marquez should explain that the associates of Madigan were former ward committeemen and aldermen,

that it was a "favor," and that it would be up to Doherty to prove that Madigan's associates performed work, not ComEd.

c.  On or about February 11, 2019, McClain had a conversation with John Hooker, who by that time had retired from ComEd, but had continued to serve as a paid external lobbyist to ComEd. In discussing how the renewal of Jay D. Doherty & Associates' contract—which included significant payments to Jay D. Doherty & Associates to account for indirect payments to Madigan's associates—should be communicated internally, McClain said, "We had to hire these guys because [Madigan] came to us. It's just that simple." Hooker agreed, and added, "It's, it's clean for all of us."

d.  On or about February 13, 2019, Doherty advised ComEd senior vice president for legislative and external affairs Fidel Marquez that Madigan associates Olivo and Moody had been made "subcontractors" of Jay D. Doherty & Associates at the request of Hooker, and that Madigan associate Zalewski was also currently being paid as a "subcontractor." Doherty emphasized that he had told no one of the arrangement per instructions previously given to him, and cautioned Marquez that ComEd should not tamper with the arrangement because "your money comes from Springfield," and that Doherty had "every reason to believe" that McClain had spoken to Madigan about the retention of Madigan's associates, and knew Hooker had done so. Doherty added that Madigan's associates "keep their mouth shut, and, you know, so. But, do they do anything for me on a day to day basis? No." Doherty explained that these payments were made

"to keep [Madigan] happy, I think it's worth it, because you'd hear otherwise."

e.  On or about March 5, 2019, McClain and ComEd personnel participated in a meeting during which they discussed Jay D. Doherty & Associates' contract and why the indirect payments to Madigan's associates made under the guise of that contract should be continued for another year. During that meeting, McClain explained that for decades, Madigan had named individuals to be ComEd employees, such as meter readers, as part of an "old-fashioned patronage system." In response, a ComEd employee acknowledged that such hires could be a "chip" used by ComEd. ComEd renewed Jay D. Doherty & Associates' contract.

f.  On or about March 6, 2019, McClain and Hooker discussed the renewal of Jay D. Doherty & Associates' contract. During the conversation, Hooker explained that "with the [Doherty] stuff, you got a little leg up," to which McClain agreed. Hooker later added, "I mean it's uh, unmentioned, but you know, that which is understood need not be mentioned." McClain responded, "Right. Exactly. Exactly."

115.  Between in and around 2011 and 2019, indirect payments made to Madigan's associates—who performed little or no work for ComEd—totaled approximately $1,324,500. These indirect payments were made not only through Jay D. Doherty & Associates, but through other additional third-party vendors. As with Jay D. Doherty & Associates, these other third-party vendors entered into contracts with ComEd that noted that the payments made to these vendors by ComEd were for consulting and related services, when in truth, a substantial portion

of the money paid to these vendors was intended for Madigan's associates, who did little or no work for ComEd. These payments, like those made indirectly through Jay D. Doherty & Associates, were intended to influence and reward Madigan in connection with the advancement and passage of legislation favorable to ComEd in the Illinois General Assembly.

116.    Prior to ComEd's discovery of the federal law enforcement investigation, Madigan's and McClain's approval was sought by ComEd before payments to certain of Madigan's associates were discontinued, even though these individuals performed little or no work for ComEd. As with the payments made to Madigan's associates through Jay D. Doherty & Associates, despite that Madigan's associates were subcontracted under and receiving payments through these third party vendors, no such payments were identifiable in ComEd's vendor payment system. Certain former ComEd executives designed these payment arrangements in part to conceal the size of payments made to Madigan's associates, and to assist ComEd in denying responsibility for oversight of Madigan's associates, who performed little or no work for ComEd.

3.    **In 2017, ComEd further bribed Madigan by agreeing to his request that another of his associates be appointed to the ComEd board of directors.**

117.    Beginning in or around 2017, Madigan sought the appointment of his associate Juan Ochoa to the ComEd Board of Directors. Madigan's request was communicated by Madigan's lieutenant McClain to ComEd CEO Anne Pramaggiore. In or around May 2018, in response to internal company opposition to the appointment of Ochoa, Pramaggiore asked McClain if Madigan would be satisfied if Pramaggiore arranged for Ochoa to receive a part-time job that paid an equivalent amount of money to a board member position, namely, $78,000 a year. McClain told ComEd's CEO that Madigan would appreciate if she would "keep pressing" for the appointment of Ochoa as a board member. ComEd's CEO agreed to do so.

118.     In or around September 2018, Pramaggiore (who by this time had been promoted to an executive position within Exelon, in which capacity she still maintained oversight authority over ComEd) assured McClain that she was continuing to advocate for the appointment of Ochoa made at Madigan's request because: "You take good care of me and so does our friend [Madigan] and I will do the best that I can to, to take care of you." This was an express acknowledgement of a quid pro quo whereby ComEd and Exelon (through Pragmaggiore) continued rewarding Madigan for his corrupt support for ComEd's and Exelon's preferred legislation.

119.     On or about April 25, 2019, Pragmaggiore advised McClain by text message, "Just sent out Board approval to appoint [Ochoa] to ComEd Board." The following day, April 26, 2019, ComEd filed a notice with the United States Securities and Exchange Commission stating that Ochoa had served as a director of ComEd since April 2019.

120.     Although ComEd and Exelon conducted due diligence on Ochoa and claimed they determined he was qualified for a Board position, no one at ComEd or Exelon recruited Ochoa for the position and there was initial internal opposition to his appointment. ComEd did not interview or vet other outside candidates for the vacant board seat. ComEd appointed Ochoa, in part, with the intent to influence and reward Madigan in connection with Madigan's official duties.

**4.      ComEd, Doherty, and Jay D. Doherty & Associates used mail and wire fraudulently to obfuscate the payments to Madigan and their corrupt nature.**

121.     Between 2011 and 2019, Doherty executed written contracts and submitted invoices to ComEd that made it falsely appear that the payments made to Jay D. Doherty & Associates were all in return for Doherty's advice on "legislative issues" and "legislative risk management activities," and other similar matters, when in fact a portion of the compensation

paid to Jay D. Doherty & Associates was intended for ultimate payment to Madigan's associates, who in fact did little or no work for ComEd. Upon information and belief, these false invoices were submitted using interstate mail and/or wire.

122. Because they were paid indirectly through Jay D. Doherty & Associates, moreover, the payments to Madigan's associates over the course of approximately eight years were not reflected in the vendor payment system used by ComEd, and as a result, despite that Madigan's associates were subcontracted under and receiving payments through Jay D. Doherty & Associates, no such payments were identifiable in ComEd's vendor payment system. Upon information and belief, the purpose of structuring these payment arrangements in this manner was to obfuscate their exorbitance and to avoid scrutiny from the ICC and/or public as to the corrupt purposes of the payments.

**C.    ComEd and Exelon knowingly furthered the activities of Madigan's corrupt enterprise.**

123. ComEd and Exelon knowingly agreed to facilitate the activities of Madigan's enterprise, which at its core involved providing economic value to Madigan's allies and Madigan in exchange for Madigan's support for legislation that furthered corporate interests. As applied to ComEd and Exelon, the activities of the enterprise involved an illegal exchange of economic value for Madigan's support for EIMA and FEJA, and creation of a false and misleading document trail to conceal the illegal nature of the underlying transactions.

124. ComEd's and Exelon's knowledge of the enterprise's activities is also demonstrated by several admissions by ComEd that expressly acknowledge that its senior executives willfully participated in the enterprise's schemes. For example, in the Deferred Prosecution Agreement, ComEd admits the following facts:

a.   In or around 2011, ComEd's then executive vice president of legislative and external affairs John Hooker jointly "developed a plan to direct money" to Madigan's associates Ed Moody and Frank Olivo Jr. Hooker worked with ComEd's outside lobbyist Michael McClain to develop this plan. "Certain senior executives and agents of ComEd were aware of these payments [to Olivo and Moody] from their inception until they were discontinued in or around 2019."

b.   ComEd entered into a contract with Reyes Kurson "in part, with the intent to influence and reward Public Official A in connection with Public Official A's official duties and because personnel and agents of ComEd understood that giving this contract to Law Firm A was important to Public Official A."

c.   On January 20, 2016 (after some ComEd employees attempted to reduce the hourly legal work for Reyes Kurson and attorney Victor Reyes complained to ComEd lobbyist Michael McClain), McClain wrote to ComEd's CEO Anne Pramaggiore: "Individual A contacted CEO-1 and wrote, "I am sure you know how valuable [Victor Reyes] is to our Friend [Madigan] . . . . I know the drill and so do you. If you do not get involve [sic] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend [Madigan]. Our Friend [Madican] will call me and then I will call you. Is this a drill we must go through?" Pramaggiore replied in writing, "Sorry. No one informed me. I am on this."

d.     In May 2018, ComEd's CEO Anne Pramaggiore personally "approved" the arrangement whereby ComEd would make payments to Madigan's associate Michael Zawelski. At the time of this approval, she "was aware that there were other associates of [Madigan] that were paid indirectly as subcontractors through [Jay D. Doherty & Associates], which [Pramaggiore] referred to as the 'roster.'"

e.     In or around September 2018, Pramaggiore (who by this time had been promoted to an executive position within Exelon, in which capacity she still maintained oversight authority over ComEd) assured McClain that she was continuing to advocate for the appointment of Ochoa made at Madigan's request because: "You take good care of me and so does our friend [Madigan] and I will do the best that I can to, to take care of you."

f.     On February 11, 2019, ComEd lobbyist McClain admitted to fellow ComEd lobbyist and former ComEd executive Hooker: "We had to hire these guys [i.e., Madigan's associates Moody, Olivo and Zawelski] because [Madigan] came to us. It's just that simple."

g.     On February 13, 2019, ComEd lobbyist Jay Doherty told ComEd Senior Vice President of Governmental and External Affairs Fidel Marquez that "ComEd should not tamper with the arrangement because 'your money comes from Springfield,' and that [Doherty] had 'every reason to believe' that [ComEd lobbyist Michael McClain] had spoken to [Madigan] about the retention of [Madigan's] associates, and knew [ComEd lobbyist John Hooker] had done so." Doherty further explained to Marquez that

Madigan's associates "keep their mouth shut . . . . But, do they do anything for me on a day to day basis? No." Nonetheless, he explained "these payments were made "to keep [Madigan] happy, I think it's worth it, because you'd hear otherwise." Afterwards, ComEd assigned another employee "the task of ensuring [Reyes Kurson]'s contract was renewed because the work provided to [Reyes Kurson] was, in part, designed to influence and reward [Madigan] in connection with [Madigan]'s official duties, including the promotion and passage of FEJA. ComEd agreed in or around June 2016 to renew [Reyes Kurson's] contract with substantially reduced annual hours."

h.    On March 5, 2019, ComEd lobbyist Michael McClain explained to ComEd employees that "[Madigan] had named individuals to be ComEd employees, such as meter readers, as part of an 'old-fashioned patronage system.' In response, a ComEd employee acknowledged that such hires could be a 'chip' used by ComEd." McClain made this statement while discussing the renewal of ComEd's contract with Jay D. Doherty & Associates.

125.    ComEd and Exelon also knowingly structured ComEd's payments to Madigan's associates for the purpose of concealing its activities and protecting Madigan's enterprise. For example, in 2011, ComEd's executive vice president of legislative and external affairs John Hooker and its lobbyist Michael McClain were jointly responsible for establishing the plan to pay Madigan associates Frank Olivo and Ed Moody indirectly through Jay D. Doherty & Associates. Structuring the payments in this manner concealed the details of the ultimate

recipients off ComEd's vendor payment system. When discussing the renewal of this arrangement in 2019, Hooker stating regarding this structure: "it's clean for all of us." Upon information and belief, this statement was meant to convey that the arrangement protected ComEd's interests by concealing the dirty (i.e., illegal) nature of the transaction. In another conversation regarding the arrangement in 2019, Hooker similarly remarked, "I mean it's uh, unmentioned, but you know, that which is understood need not be mentioned." This remark further confirms ComEd's desire to conceal the payments.

126. ComEd also accepted invoices from Jay D. Doherty & Associates between 2011 and 2019 that, by ComEd's admission, "made it falsely appear that the payments made to [Jay D. Doherty & Associates] were all in return for Consultant 1's advice on 'legislative issues' and 'legislative risk management activities,' and other similar matters, when in fact a portion of the compensation paid to [Jay D. Doherty & Associates] was intended for ultimate payment to [Madigan]'s associates, who in fact did little or no work for ComEd." Based on the admissions noted above, ComEd knew these invoices were false and misleading when it made payments on them, and in fact designed the entire scheme to conceal the true nature of the payments.

**D.  Without the bribery-induced support of Madigan, ComEd would not have secured favorable legislation allowing it to increase rates in the amounts it obtained and charged consumers.**

127. ComEd admits that the reason it bribed Madigan was to secure his "support for legislation that was beneficial to ComEd, including EIMA and FEJA, that would ensure a continued favorable rate structure for ComEd." Why Madigan? Because "ComEd understood that, as Speaker of the House of Representatives, [Madigan] was able to exercise control over what measures were called for a vote in the House of Representatives and had substantial influence and control over fellow lawmakers concerning legislation, including legislation that affected ComEd."

128.     This was true and, if anything, an understatement. According to David Axelrod, long-time Illinois political consultant and Senior Adviser to President Obama, no one in modern Illinois politics wields as much legislative power: "In his domain—in terms of the art of keeping and exercising power within [the state capitol]—he's incomparable."[6] Madigan is widely considered the most powerful man in Illinois politics, and he wielded unparalleled and unprecedented control over the House.

129.     As with most Houses of Representatives in the United States, the Speaker of the Illinois House of Representatives is the leader of the party with most of the votes in the chamber. This position gave Madigan substantial influence over a significant number of votes on practically any issue.

130.     Moreover, the Illinois House of Representatives has a variety of special rules that allowed Madigan outsized influence in the body. For example, as the Speaker, Madigan wielded the power to select the chair and a majority of the members of the Rules Committee. The Rules Committee, in turn, decides whether to send a bill to a substantive committee, which itself must vote to send the bill to a full House vote before the bill can leave the chamber. Getting around this protocol is exceedingly difficult, meaning that through this provision alone, Madigan has the de facto ability to control which bills get voted on and which ones do not.

131.     Furthermore, Illinois rules gave Madigan sole discretion to give and take away committee chair positions for all 49 substantive committees. These positions were coveted because they gave other legislators more power than they would otherwise have and also provide $10,000 annual stipends. This rule enabled Madigan to use committee chair appointments to

---

[6] Dave McKinney, *The man behind the fiscal fiasco in Illinois*, Reuters (Feb. 8, 2017), available at https://www.reuters.com/investigates/special-report/usa-illinois-madigan/

reward loyalty or punish disloyalty—yet another tool for consolidating power and controlling votes.[7]

132.    Taken together, these rules, and Madigan's extraordinary consolidation of party power, allowed Madigan to control the outcome of virtually all major legislation in the Assembly.

133.    But, critically, Madigan did not always use these powers to benefit ComEd. Indeed, not too long ago, ComEd counted Madigan among its greatest foes. In 2003, for example, he "torpedoed a rate hike that John Rowe, then CEO of ComEd parent Exelon, said was needed to complete his plan to acquire troubled downstate utility Illinois Power."[8]

134.    In the four years that followed, Madigan and Rowe engaged in "cold and hot warfare" that culminated in a 2007 rate hike compromise made possible only because then-Senate President Emil Jones was a staunch ComEd backer. But with Jones set to retire, ComEd came to understand that it had little chance of legislative success without Madigan's support.

135.    What followed was a "sustained charm offensive"—consisting of generous campaign donations and, as described above, bribes—to win support for ComEd's legislative agenda.[9]

136.    After soliciting and receiving bribes, Madigan's position on ComEd and rate hikes changed dramatically, and he used his immense power to ensure the passage of at least two major pieces of legislation that benefitted ComEd at the expense of its ratepayers.[10]

---

[7] Joe Tabor and Ted Dabrowski, *Madigan's Rules: How Illinois gives its House speaker power to manipulate and control the legislative process*, Illinois Policy Institute (2017), available at https://www.illinoispolicy.org/reports/madigans-rules-how-illinois-gives-its-house-speaker-power-to-manipulate-and-control-the-legislative-process

[8] Steve Daniels, *How long-ago power plays set ComEd's current woes in motion*, Chicago Business (December 20, 2019), available at https://www.chicagobusiness.com/utilities/how-long-ago-power-plays-set-comeds-current-woes-motion

[9] *Id.*

[10] *Id.*

-32-

## 1. **EIMA would not have passed without Madigan's support.**

137.     These efforts bore fruit with EIMA, an extremely ambitious bill that secured nearly automatic rate-hikes to the great benefit of ComEd and at the considerable expense of Plaintiffs and the proposed Class.

138.     As described above, if ComEd had not "played ball" with Madigan, he could have killed the bill, as he had done with similar efforts in the past. But it did, and so he did not. Indeed, it was clear from the start that any opposition to the bill "was cooked in the House," because it was "the bill th[at Madigan] want[ed]."[11]

139.     EIMA was first introduced in the Senate in February 2011. After securing the requisite votes, the bill arrived in the House.

140.     Madigan referred the bill to the Rules Committee (over which he exerts substantial control, as described above), which in turn assigned the bill to the Executive Committee (chaired by Daniel J. Burke, whom the Chicago Sun Times notes was "closely aligned with Illinois House Speaker Michael Madigan"[12]). After a series of amendments and debates, the House passed bill with 67 votes, only seven more than the 60 required.

141.     The bill then returned to the Senate, which approved the amendments with only 31 votes, just one more than the minimum required.

142.     Later that year, then-Governor Pat Quinn vetoed the bill. The veto was overridden with 36 votes in the Senate (the bare minimum required) and 74 votes in the House (just three more than 71-vote minimum), and in October 2011, the bill became law.

---

[11] *Id.*
[12] Robert Herguth, *Leaving Legislature lucrative for Ed Burke brother now drawing $160K in pensions*, Chicago Sun Times (Jan. 25, 2019), available at https://chicago.suntimes.com/2019/1/25/18404347/leaving-legislature-lucrative-for-ed-burke-brother-now-drawing-160k-in-pensions

143.     As noted above, Madigan could have killed the bill effectively on his own. And to override the veto, Madigan—the most powerful man in Illinois politics—need only have influenced the vote of three members of the 118-member chamber he had overseen for decades and over whom he wielded considerable leverage, or a single vote in the Senate, where he also exerted influence due to his continued role as Democratic party chair.

144.     Put simply, without Madigan's fraudulently-secured support, EIMA would not have passed.

## 2.     FEJA would not have passed without Madigan's support.

145.     Madigan's role in passing FEJA was also critical to its success.

146.     As described herein, FEJA was an extremely valuable bill to ComEd. Among other things, it financed a bailout of out two struggling Exelon nuclear power plants on the backs of ratepayers, who would be saddled with $200 million a year in extra payments. It also permitted ComEd to profit on energy efficiency programs, again at the expense of ratepayers.

147.     According to reports, "Madigan took the lead in shepherding" the legislation through the Assembly.[13] His efforts took root as early as 2014, when he advanced a House Resolution warning of the "dire consequences" of allowing Exelon's nuclear power plants to fail and advocating a "market-based" solution—e.g., rate increases—to bail Exelon out.[14]

148.     As described in an independent news report:

> Emails between Madigan's top advisers and McClain show how they worked in tandem to silence dissent on the pro-bailout resolution by hand-picking the lawmakers who would get to vote on it in a legislative committee.

---

[13]Steve Daniels, *How long-ago power plays set ComEd's current woes in motion*, Chicago Business (December 20, 2019), available at https://www.chicagobusiness.com/utilities/how-long-ago-power-plays-set-comeds-current-woes-motion
[14] https://ilga.gov/legislation/fulltext.asp?DocName=09800HR1146&GA=98&SessionId=85&DocTypeId=HR&LegID=82396&DocNum=1146&GAID=12&SpecSess=&Session=

> Ahead of the vote, Exelon had identified at least six Democratic members of the committee who were likely to vote against the company's interests. In response, Will Cousineau, a high-ranking member of the speaker's staff, suggested a plan to remove opponents from the committee for this one vote.
>
> The next day the opponents Exelon had identified were substituted from the committee — and the resolution passed 16 to 0. Cousineau's tactic delighted McClain so much, he wrote him, "I love you."
>
> Two years after that resolution was unanimously approved by the House Environment Committee, Exelon won legislative approval for a multi-billion-dollar ratepayer bailout.
>
> Cousineau later left Madigan's staff and became a lobbyist. His clients included ComEd.[15]

149.    FEJA was a controversial bill, and it too would not have passed without Madigan's involvement. The bill was introduced in the Senate in February 2016, and arrived in the House in April 2016. The Madigan-controlled Rules Committee assigned the bill to the Executive Committee, and after nearly eight months of proceedings, the bill went to a vote. It passed with 63 votes, just three more than the minimum required.[16] That same day, the senate adopted the House amendments with 32 votes, just two more than necessary.

150.    This was a huge win for ComEd. It would never have happened without Madigan, or his co-conspirator, close ally, and ComEd lobbyist McClain, who was "at the forefront" of the FEJA "effort." At a party to celebrate the passage of the bill, Exelon Chief Strategy Officer

---

[15] Dave McKinney et al., *Emails Show ComEd Lobbyist's Deep Impact In Madigan's Inner Circle*, WBEZ (Feb. 21 2020), available at https://www.wbez.org/stories/emails-show-comed-lobbyists-deep-impact-in-madigans-inner-circle/e6397b1f-a88a-4d65-95af-987fd7ae5cd0
[16] Madigan himself did not vote, presumably because he had already secured enough supports from the members of the chamber he controlled.

William Von Hoene reportedly told McClain head had "saved [Exelon] more than hundreds of millions" of dollars.[17]

### 3. EIMA and FEJA harmed Plaintiffs and the proposed Class of similarly-situated utility customers by enabling ComEd to charge them more for electricity over the course of a decade.

151.    ComEd admits "that the reasonably foreseeable anticipated benefits to ComEd" of the favorable legislation it secured by bribing Madigan was at least "$150,000.000." In reality, it was much, much more.

152.    By some accounts, ComEd's rates increased by more than $700 million under the rate-setting formula set by EIMA.[18] Other sources estimate that EIMA has added "billions" to the bills of ComEd's electricity customers.[19] Much if not all of that increase is attributable directly to EIMA and exceeds the rates that Plaintiffs and the Class would have paid but for the RICO scheme.

153.    FEJA has proved similarly lucrative for ComEd, resulting in hundreds of millions of dollars of annual rate increases[20] which, again, would never have been extracted from consumers without the RICO scheme.[21]

---

[17] Steve Daniels, *How long-ago power plays set ComEd's current woes in motion*, Chicago Business (December 20, 2019), available at https://www.chicagobusiness.com/utilities/how-long-ago-power-plays-set-comeds-current-woes-motion

[18] Steve Daniels, *ComEd asks Springfield to force you to make a 13-year bet on interest rates*, Chicago Business (March 15, 2019), available at https://www.chicagobusiness.com/utilities/comed-asks-springfield-force-you-make-13-year-bet-interest-rates

[19] Mike O'Boyle, *After Investing Billions, Is Illinois Grid Modernization Paying Off For Utilities And Customers?*, Forbes (Nov. 28, 2017), available at https://www.forbes.com/sites/energyinnovation/2017/11/28/after-investing-billions-is-illinois-grid-modernization-paying-off-for-utilities-and-customers/#3b4dfb054c56

[20] *Id.*

[21] By some estimates, FEJA cost an average ComEd household approximately $29 in the first year alone. Steve Daniels, Charges for green power, nuke subsidies hike electric bills, Chicago Business (June 14, 2017), available at https://www.chicagobusiness.com/article/20170614/NEWS11/170619959/comed-customers-paying-extra-starting-this-month-to-support-nuclear-renewable-power

## STATUTES OF LIMITATIONS – RICO CLAIMS

154. **Discovery Rule**. Plaintiffs' RICO claims did not accrue until July 17, 2020, when the Department of Justice announced the bribery charge against Defendant ComEd and the associated Deferred Prosecution Agreement. Until that date, Plaintiffs did not discover their injuries: that their utility rate structure was inflated due to Defendants' illegal acts. Given the concealed nature of Defendants' bribery scheme, Plaintiffs could not have discovered their injuries before July 17, 2020. Even if Plaintiffs knew or should have known of their injuries before July 17, 2020, they did not know and could not have known Defendants' role in causing those injuries.

155. **Equitable Tolling**. Even if Plaintiffs' RICO claims accrued before July 17, 2020, the statutes of limitations are equitably tolled. Until July 17, 2020, Plaintiffs were unable to discover evidence vital to their RICO claims, namely that Defendants ensured the passage of EIMA and FEJA through bribery. Plaintiffs exercised due diligence by paying on the inflated rate structure on the assumption of the integrity of the political process behind that structure. And Plaintiffs filed this lawsuit promptly after learning of the essential facts.

156. **Fraudulent Concealment**. Even if Plaintiffs' RICO claims accrued before July 17, 2020, Defendants are estopped from enforcing the statutes of limitations due to their knowing and active affirmative steps to conceal the corrupt scheme. First, Defendants' illegal payments were by their nature self-concealing. Second, Defendants took additional steps beyond the illegal payments themselves to conceal the misconduct from Plaintiffs, including for example by funneling payments to Madigan's associates through a third-party consultant to keep the payments off of ComEd's vendor payment system. ComEd also used invoices that falsely presented the purposed services for the charges. Although Plaintiffs are not in a position to know, without discovery, the precise content of the payment reporting and invoices, Defendant

ComEd has admitted to both. The only plausible purpose of this cover-up was to prevent regulators and customers, including Plaintiffs, from discovering the illegal payments. Had ComEd properly recorded the recipients of the payments and the fact that the payments did not reflect any actual services, the illegal nature of the payments would have been discovered by internal whistleblowers or by regulators such as the Illinois Interstate Commerce Commission, with subsequent publicity ensuing. Defendants' successful cover-up accordingly prevented Plaintiffs from knowing of their claims despite due diligence.

## STATUTES OF LIMITATIONS – STATE-LAW CLAIMS

157. **Discovery Rule**. Plaintiffs' state-law claims did not accrue until July 17, 2020, when the Department of Justice announced the bribery charge against Defendant ComEd and the associated Deferred Prosecution Agreement. Until that date, Plaintiffs did not and could not reasonably know they had been injured, by whom, or that their injuries were wrongfully caused. All that Plaintiffs knew before that date was that they paid certain utility rates, information that, standing alone, was not sufficient to apprise a reasonable person of the need for further inquiry to determine whether a legal wrong had been committed.

158. **Continuing Violations**. Even if Plaintiffs' state-law claims accrued before July 17, 2020, those claims are timely because Defendants' violations are of a continuing nature. First, Defendants' participation in the Madigan enterprise, including illegal payments to Madigan's associates, continued at least into 2019. Second, individual incidents of harm to Plaintiffs in the form of inflated utility rates continue to occur to the present. At minimum, even if Plaintiffs' claims accrued upon the first inflated payment, and even if Plaintiffs' claims are not otherwise tolled, Plaintiffs' claims are timely as to any inflated payment within the limitations period measured back from the date of filing.

159. **Equitable Tolling**. Even if Plaintiffs' state-law claims accrued before July 17, 2020, the applicable statutes of limitations are equitably tolled until that date. Until July 17, 2020, Plaintiffs were unable to discover the necessary information to file their claims, namely that Defendants ensured the passage of EIMA and FEJA through bribery. Plaintiffs exercised due diligence by paying on the inflated rate structure on the assumption of the integrity of the political process behind that structure. And Plaintiffs filed this lawsuit promptly after learning of the essential facts.

160. **Fraudulent Concealment**. Even if Plaintiffs' state-law claims accrued before July 17, 2020, Plaintiffs' claims are timely due to Defendants' fraudulent concealment of the causes of action. *See* 735 Ill. Comp. Stat. § 5/13-215. First, Defendants' illegal payments were by their nature self-concealing. Second, Defendants took additional steps beyond the illegal payments themselves to conceal the misconduct from Plaintiffs, including for example (as Defendant ComEd admits) by funneling payments to Madigan's associates through a third-party consultant to keep the payments off of ComEd's vendor payment system. ComEd also used invoices that falsely presented the purposed services for the charges. Although Plaintiffs are not in a position to know, without discovery, the precise content of the payment reporting and invoices, Defendant ComEd has admitted to both. The only plausible purpose of this cover-up was to prevent regulators and customers, including Plaintiffs, from discovering the illegal payments. Had ComEd properly recorded the recipients of the payments and the fact that the payments did not reflect any actual services, the illegal nature of the payments would have been discovered by internal whistleblowers or by regulators such as the Illinois Interstate Commerce Commission, with subsequent publicity ensuing. Defendants' successful cover-up accordingly prevented Plaintiffs from knowing of their claims despite due diligence.

161. **Equitable Estoppel**. Even if Plaintiffs' state-law claims accrued before July 17, 2020, Defendants are equitably estopped from asserting the statutes of limitations. Defendants misrepresented the purpose of their illegal payments in invoices and concealed those facts by funneling illegal payments through a third-party consultant. Defendants knew that the invoices were false and the payment records concealing when they were created. Plaintiffs were, until at least July 17, 2020, unaware of the fact or nature of Defendants' illegal payments. Defendants intended that the false invoices and payment misdirection by relied upon. Plaintiffs, by trusting the integrity of the political process that created the rate structure, did rely on Defendants' concealment of material facts. And Plaintiffs will be prejudiced if Defendants are not estopped.

## RULE 23 ALLEGATIONS

162. Plaintiffs bring this action on behalf of themselves and all other similarly situated ComEd utility customers under Rule Federal Rule of Civil Procedure 23. Plaintiffs seek to represent a Class defined as:

> All individuals and entities who either were customers of ComEd, or who otherwise paid ComEd for electricity, after ComEd increased its rates under the EIMA.

Excluded from the Class are Defendants, their agents, employees, and wholly or partly owned subsidiaries; other members of the enterprise; Plaintiffs' counsel and their employees; and the Judge and court staff to whom this case is assigned, and their immediate families.

163. The proposed Class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and 23(g):

    a.    **Numerosity**. The Class consists of more than a million Class members throughout Northern Illinois, making joinder impracticable. Further, ComEd has records that identify each Class member. The Class is thus readily ascertainable.

b.   **Commonality**. Numerous common questions exist, the answers to which
would drive resolution of the litigation, including: (i) whether Defendants
paid bribes; (ii) whether Defendants' bribes caused increased electricity
rates; and (iii) the amount of increase in electricity rates caused by
Defendants' bribes.

c.   **Typicality**. Plaintiffs' claims are typical of the Class members' claims
because they and all Class members were injured through ComEd's
uniform misconduct. The claims of Plaintiffs and Class members arise
from the same operative facts and are based upon the same legal theories.
There are no defenses unique to Plaintiffs.

d.   **Adequacy**. Plaintiffs are adequate Class representatives because their
interests do not conflict with the interests of the other members of the
Class they seek to represent. Plaintiffs have retained counsel competent
and experienced in class action litigation, RICO, and complex matters.

164.   The proposed Class satisfies the requirements of Federal Rule of Civil Procedure
23(b)(3):

a.   **Predominance**. Common questions predominate over any individual
questions because the important and prevalent issues in this case concern
Defendants' conduct and its effects, which are common to the Class.
Individual issues are minor and may be nothing more than damages
calculations pursuant to a formula. In addition, the same law applies to all
Class members' claims.

b.    **Superiority**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages suffered by Plaintiffs and Class members, while collectively substantial, are relatively small per Class member compared to the burden and expense required to individually litigate their claims. It would be virtually impossible for Class members individually to seek redress from this complex RICO scheme. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Both liability and damages can be determined in one classwide proceeding.

165.    The proposed Class certifies the requirements of Federal Rule of Civil Procedure 23(c)(4) because, if a Class cannot be certified for all issues, it would be appropriate to certify particular common issues concerning Defendants' conduct and its effects.

166.    The proposed Class satisfies the requirements of Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole. Specifically, every Class member is equally entitled to an injunction against the imposition of illegal rates, or a declaration that the rates are illegal.

# CAUSES OF ACTION

## Count I— Violation of the Racketeer Influenced and
## Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c)-(d)

### A.  ComEd's and Exelon's personhood under RICO

167.    ComEd and Exelon are "persons" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property." They can be held liable civilly under RICO.

### B.  ComEd and Exelon participated in a RICO enterprise

168.    Madigan's enterprise was an "association-in-fact enterprise" within the meaning of 18 U.S.C. §1962. The purpose of the enterprise was to enable its members to exploit the democratic legislative process for their own personal gain. Known members of the enterprise include ComEd, Exelon and the following nonparties: Illinois Speaker of the House Michael Madigan; ComEd lobbyist Michael McClain, Madigan's associate Edward Moody; Madigan's associate Frank Olivo Jr.; Madigan's associate Michael Zalewski; Madigan's associate Juan Ochoa; Anne Pramaggiore, the former CEO of ComEd and Exelon; John Hooker, ComEd's former executive vice president of legislative and external affairs; Fidel Marquez, ComEd's former Senior Vice President, Governmental and External Affairs; Jay Doherty, ComEd's lobbyist; and his company, Jay D. Doherty & Associates. Upon information and belief, several other persons also participated in the enterprise. Discovery would identify them.

### C.  ComEd and Exelon participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

169.    The enterprise engaged in a pattern of racketeering conduct over a period of years, starting at least as early as 2011 and continuing through 2019.

170.    Racketeering activity under RICO includes "any act or threat involving . . . bribery . . . which is chargeable under State law and punishable by imprisonment for more than

one year." 18 U.S.C. §1961(1). It also includes mail and wire fraud under 18 U.S.C. §§1341, 1343.

171. Between 2011 and 2019, Defendants committed (*see* 18 U.S.C. §1962(c)—and/or conspired with other members of Madigan's enterprise to commit (see 18 U.S.C. §1962(d))—dozens (possibly hundreds) of acts of bribery and mail and/or wire fraud.

**2.**    **ComEd and Exelon participated in acts involving bribery under Illinois law.**

172. The Illinois Criminal Code criminalizes bribery. The Code defines five types of "bribery." 720 Ill. Comp. Stat. Ann. 5/33-1. Each form of bribery under § 33-1 is a Class 2 felony punishable by three to seven years in prison. 730 ILCS 5/5-4.5-35.

173. A person commits bribery under § 33-1(c) when he, "[w]ith intent to cause any person to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he or she promises or tenders to that person any property or personal advantage which he or she is not authorized by law to accept." 720 Ill. Comp. Stat. Ann. 5/33-1(c). ComEd and/or Exelon committed this type of bribery on multiple occasions by offering positions and paying money to at least five of Madigan's associates with the intent to cause them to influence Madigan's support for EIMA and FEJA and for ComEd and Exelon generally in his official capacity as Speaker of House. Because ComEd made regular payments to these associates over the course of eight years, ComEd likely committed bribery under § 33-1(c) dozens (possibly hundreds) of times. Specifically:

　　　　a.    With the intent to cause Frank Olivo Jr. to influence Madigan's support for EIMA and for ComEd and Exelon generally in his official capacity as Speaker of the House, ComEd offered a consulting position (i.e., a "personal advantage") to Olivo in or around 2011.

b.      With the intent to cause Ed Moody to influence Madigan's support for EIMA and for ComEd and Exelon generally in his official capacity as Speaker of the House, ComEd offered a consulting position (i.e., a "personal advantage") to Moody in or around 2011.

c.      With the intent to cause Frank Olivo Jr. to influence Madigan's support for EIMA, FEJA, and for ComEd and Exelon generally in his official capacity as Speaker of the House, ComEd repeatedly tendered money (i.e., "property") to22 Olivo between 2011 and 2019.

d.      With the intent to cause Ed Moody to influence Madigan's support for EIMA, FEJA, and for ComEd and Exelon generally in his official capacity as Speaker of the House, ComEd repeatedly tendered money (i.e., "property") to23 Moody between 2011 and 2019.

e.      With the intent to cause Victor Reyes to influence Madigan's support for EIMA, FEJA, and for ComEd and Exelon generally in his official capacity as Speaker of the House, ComEd executed a contract that gave valuable rights (i.e., "property") to Reyes' law firm Reyes Kurson on an annual basis beginning in 2011.

f.      With the intent to cause Victor Reyes to influence Madigan's general support for ComEd and Exelon in his official capacity as Speaker of the House, ComEd also executed a contract that gave valuable rights (i.e., "property") to Reyes' law firm Reyes Kurson on an annual basis continuing after renewal in 2016.

---

[22] The payments passed through Jay D. Doherty & Associates.
[23] The payments passed through Jay D. Doherty & Associates.

g.   With the intent to cause Victor Reyes to influence Madigan's support for EIMA, FEJA, and for ComEd and Exelon generally in his official capacity as Speaker of the House, ComEd repeatedly tendered money (i.e., "property") to Reyes' law firm Reyes Kurson each year between 2011 and 2019.

h.   With the intent to cause Michael Zalewski to influence Madigan's general support for ComEd and Exelon in his official capacity as Speaker of the House, ComEd offered Zalewski a consulting position (i.e., a "personal advantage") to Zalewski in or around 2018.

i.   With the intent to cause Michael Zalewski to influence Madigan's general support for ComEd and Exelon in his official capacity as Speaker of the House, ComEd repeatedly tendered money (i.e., "property") to[24] Zalewski between 2018 and 2019.

j.   With the intent to cause Juan Ochoa to influence Madigan's general support for ComEd and Exelon in his official capacity as Speaker of the House, ComEd and Exelon offered a seat on the ComEd Board of Directors (i.e., a "personal advantage") to Ochoa in 2019.

k.   With the intent to cause Juan Ochoa to influence Madigan's general support for ComEd and Exelon in his official capacity as Speaker of the House, ComEd tendered money (i.e., "property") to Ochoa in 2019 and 2020.

---

[24] The payments passed through Jay D. Doherty & Associates.

174. A person commits bribery under § 33-1(a) when he, "[w]ith intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he or she promises or tenders to that person any property or personal advantage which he or she is not authorized by law to accept." 720 Ill. Comp. Stat. Ann. 5/33-1(a). ComEd and/or Exelon committed this type of bribery on multiple occasions by tendering Madigan with a personal advantage in the form of rewards for his loyal associates that consolidated his personal power over his "old-fashioned" patronage system. ComEd and/or Exelon performed these favors for Madigan in response to requests delivered by Madigan's lieutenant Michael McClain and with the intent to influence Madigan's support for EIMA and FEJA and for ComEd and Exelon generally in his official capacity as Speaker of House. Each of ComEd's and/or Exelon's bribes under § 33-1(c) noted in the prior paragraph also constituted bribes by ComEd and/or Exelon under § 33-1(a) because each bribe to Madigan's associates also conveyed a "personal advantage" to Madigan and ComEd and/or Exelon harbored the intent to reward Madigan.

175. A person also commits bribery under § 33-1(d) when "[h]e or she receives, retains or agrees to accept any property or personal advantage which he or she is not authorized by law to accept knowing that the property or personal advantage was promised or tendered with intent to cause him or her to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness." 720 Ill. Comp. Stat. Ann. 5/33-1(d). Non-parties Olivo, Moody, Reyes, Reyes Kurson, Zalewski, and Ochoa committed bribery under § 33(d) for each bribe ComEd made to them under § 33(c) noted above because each received the property or personal advantage described above with the requisite intent (i.e.,

knowing the property or personal advantage was tendered with intent to cause them to influence Madigan's support for ComEd and Exelon). Specifically:

a.     Olivo's knowledge is demonstrated by the fact that he performed no meaningful work for ComEd but still received tens or hundreds of thousands of dollars over the course of 8 years. He must have known that the only reason ComEd paid him this money was to influence Madigan, since no rationale company would make such large payments for no real work. His knowledge is also inferable based on Madigan's demand that ComEd hire and pay Olivo (delivered through McClain). It is highly unlikely Madigan would have made such a request if Olivo had not asked him to do so.

b.     Moody's knowledge is demonstrated by the fact that he performed no meaningful work for ComEd but still received tens or hundreds of thousands of dollars over the course of 8 years. He must have known that the only reason ComEd paid him this money was to influence Madigan, since no rationale company would make such large payments for no real work. His knowledge is also inferable based on Madigan's demand that ComEd hire and pay Moody (delivered through McClain). It is highly unlikely Madigan would have made such a request if Moody had not asked him to do so.

c.     Reyes' knowledge is demonstrated by the fact that Reyes complained to McClain in 2016 when ComEd tried to curtail the contractual hours allotted to his law firm Reyes Kurson. McClain then complained to

ComEd's CEO and specifically tied the need to pay Reyes Kurson to Madigan. Reyes had no other credible reason for complaining to McClain other than his widely known ties to McClain, which in turn demonstrates that he must have known that influencing Madigan was the real reason ComEd retained Reyes Kurson. It is highly unlikely Madigan would have made such a request if Reyes had not asked him to do so.

d.     Reyes' knowledge is imputable to Reyes Kurson.

e.     Zalewski's knowledge is demonstrated by the fact that he performed no meaningful work for ComEd but still received tens of thousands of dollars over the course of 2 years. He must have known that the only reason ComEd paid him this money was to influence Madigan, since no rationale company would make such large payments for no real work. His knowledge is also inferable based on Madigan's demand that ComEd hire and pay Zalewski (delivered through McClain). It is highly unlikely Madigan would have made such a request if Zalewski had not asked him to do so.

f.     Ochoa's knowledge is demonstrated by the fact that no member of ComEd or Exelon's board of directors recruited him. His knowledge is also inferable based on Madigan's demand that ComEd give him a board seat (delivered through McClain). It is highly unlikely Madigan would have made such a request if Ochoa had not asked him to do so.

176. ComEd conspired with Olivo, Moody, Reyes, Reyes Kurson, Zalewski, and Ochoa to commit bribery under § 33(d). As the payor, ComEd was deeply involved in each bribe.

177. Madigan committed bribery under § 33-1(d) for each bribe ComEd made to him under § 33(a) noted above because he received each personal advantage described above with the requisite intent (i.e., knowing the property or personal advantage was tendered with intent to influence his support for EIMA, FEJA and for ComEd and Exelon generally). His knowledge is demonstrated by, among other things, the statements by his lieutenant Michael McClain expressly linking Madigan's demands to his favorable treatment of ComEd and Exelon.

178. ComEd conspired with Madigan to commit bribery under § 33-1(d). As the payor, ComEd was deeply involved in each bribe, and knew of their purpose.

179. A person also commits bribery under § 33-1(e) when "[h]e or she solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an understanding that he or she shall improperly influence or attempt to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness." 720 Ill. Comp. Stat. Ann. 5/33-1(e). Non-parties McClain, Doherty, and Jay D. Doherty & Associates committed bribery under this section. Specifically:

    a.    Aside from the transactions with Reyes Kurson in 2011, McClain solicited each and every transfer of property described in the discussion of § 33-1(c) above. For each solicitation, he solicited the exchange with the understanding that he would inform Madigan of the developments and thereby attempt to influence Madigan on behalf of his client, ComEd.

b.      Doherty and Jay D. Doherty & Associates, on the other hand, "receive[d]" the bribes intended for Olivo, Moody, and Zalewski and then passed them along to their intended recipients. ComEd's Deferred Prosecution Agreement confirms that he verbally acknowledged that these Madigan associates did no real work but that at least they kept their mouths shut. He also remarked that the payments were made "to keep [Madigan] happy." These statements alone confirm Doherty's and Jay D. Doherty & Associates' knowledge that the payments were intended to improperly influence Madigan and were not legitimate commercial transactions.

180.    ComEd and Exelon conspired with McClain to commit bribery under § 33-1(e), since his solicitations were made directly to ComEd representatives, including ComEd's and Exelon's CEO, as well as several other ComEd employees.

181.    ComEd conspired with Doherty's and Jay D. Doherty & Associates' bribery under § 33-1(e), since ComEd senior executive John Hooker developed the plan to use Doherty and Jay D. Doherty & Associates as a pass-through vehicle with ComEd lobbyist Michael McClain. ComEd's CEO also acknowledged the illicit purpose behind the use of Doherty and Jay D. Doherty & Associates in 2018.

182.    Courts have held that violation of 720 ILCS 5/33-3(a)(4) is a form of "bribery" under RICO's definition of predicate acts. Violation of this act is punishable by two to five years imprisonment. See 730 ILCS 5/5-4.5-40. Under §33-3(a)(4), "[a] public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he or she commits any of the following acts: . . . [s]olicits or knowingly accepts for the performance of any act a fee or reward which he knows is not

authorized by law." Between 2011 and 2019, Madigan committed this form of official misconduct on multiple occasions by soliciting rewards from ComEd to influence his support for EIMA, FEJA and for ComEd and Exelon generally. Specifically:

a.   Madigan solicited[25] rewards in 2011 in the form of consulting jobs for Olivo and Moody in exchange for his official support for EIMA and Defendants and Exelon generally.

b.   Madigan solicited[26] rewards in 2018 in form of a consulting job for Zalewski in exchange for his official support EIMA, FEJA, and Defendants generally.

c.   Madigan solicited[27] rewards in 2019 in form of a ComEd board position for Ochoa in exchange for his official support EIMA, FEJA, and Defendants generally.

183.   ComEd conspired with Madigan and his enterprise by acquiescing to all of Madigan solicitation and providing the requested rewards. Exelon also conspired by acquiescing to the demand for Ochoa's placement on the ComEd board in 2019.

### 3.   ComEd and Exelon committed mail and wire fraud.

184.   To carry out or attempt to carry out the scheme to defraud, Defendants also conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering including mail and wire fraud. 18 U.S.C. §§ 1341, 1343.

185.   Specifically, in furtherance of their scheme to defraud, Doherty submitted (and Defendants caused to be submitted) numerous fraudulent invoices to ComEd between 2011 and 2019, which misrepresented the services provided. Although the invoices were purportedly

---

[25] Madigan delivered his demand to ComEd through his lieutenant McClain.
[26] Madigan delivered his demand to ComEd through his lieutenant McClain.
[27] Madigan delivered his demand to ComEd through his lieutenant McClain.

submitted for Doherty's advice on legislative issues and similar matters, the money was in fact intended for ultimate payment to Madigan's associates, who in fact did little or no work for ComEd. Defendants knew this was this case, since ComEd's executive vice president of legislative and external affairs John Hooker and ComEd's lobbyist Michael McClain jointly devised the scheme to use ComEd's executive vice president of legislative and external affairs. At the time, they were aware of the nature of the arrangement.

186. The details of Doherty's fraudulent invoices—including the number of such invoices and how and when they were submitted and paid—are exclusively in Defendants' control. On information and belief, supported in part by commonplace business practices, the invoices and related payments were transmitted using the mail and/or wires.

187. Moreover, because ComEd paid bribes to Moody, Olivo, and Zalewski indirectly through Jay D. Doherty & Associates, the payments to Madigan's associates over the course of approximately eight years were not reflected in the vendor payment system used by ComEd. As a result, despite that Madigan's associates were subcontracted under and receiving payments through Jay D. Doherty & Associates, no such payments were identifiable in ComEd's vendor payment system. Upon information and belief, the purpose of structuring these payment arrangements in this manner was to obfuscate their exorbitance and to avoid scrutiny from the ICC and/or public as to the corrupt purposes of the payments.

188. The Defendants also devised and furthered the scheme to defraud by use of the mail, telephone, and internet and transmitted or caused to be transmitted by means of mail and wire communication travelling in interstate or foreign commerce, fraudulent billing statements to Plaintiffs and Class members that were artificially inflated by the conduct of the Enterprise.

**D.  The Enterprise's conduct directly and proximately injured Plaintiffs' and the Class' business and/or property.**

189.    As described throughout this complaint, Defendants engaged in a pattern of related and continuous predicate acts spanning multiple years which directly and proximately injured Plaintiffs and Class members. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and Class members and obtaining significant monies and revenues from them. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

190.    By reason of and as a result of the conduct of Defendants and their pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property.

191.    As discussed above, neither EIMA nor FEJA would have passed but for Madigan's fraudulently-obtained support, and the passage of both EIMA and FEJA allowed Defendants to extract hundreds of millions of dollars (if not more) of fraudulently obtained and artificially inflated payments from Plaintiffs and the Class.

192.    Moreover, the express aim of the RICO scheme was to reward and provide personal advantage to Madigan and his associates in exchange for legislation authorizing ComEd to charge its customers more for electricity. In paying those higher rates, Plaintiffs and the Class suffered precisely the sort of injury that would be the expected consequence of Defendants' wrongful conduct.

**Count II—Civil Conspiracy**

193.    Plaintiffs bring this count on behalf of themselves and the Class and repeat and re-allege all previous paragraphs, as if fully included herein.

194.     Defendants and the enterprise participants knowingly and willfully conspired and agreed among themselves to, among other things, defraud Plaintiffs and the Class of money

195.     In furtherance of said conspiracy and agreement, Defendants engaged in fraudulent representations, omissions and concealment of facts, acts of bribery and cover-up, and consumer fraud—all calculated to steal monies from Plaintiff and the Class.

196.     All of the actions of Defendants set forth in the preceding paragraphs, were in violation of the rights of Plaintiffs and the Class and committed in furtherance of the aforementioned conspiracies and agreements.

197.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from overpaying for electricity from Defendants.

198.     These acts constituted malicious conduct that was carried on by Defendants with willful and conscious disregard for Plaintiffs' and Class members' rights with the intention of defrauding Plaintiffs and Class of money or otherwise causing injury, and was despicable conduct that subjected Plaintiffs and Class members to unjust hardship so as to justify an award of exemplary and punitive damages. Accordingly, punitive damages should be awarded against Defendants to punish them and deter them and other such persons from committing such wrongful and malicious acts in the future.

## Count III—Violation of the Illinois Consumer Fraud Act

199.     Plaintiffs bring this count on behalf of themselves and the Class and repeat and re-allege all previous paragraphs as if fully included herein.

200.     The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, *et seq*., prohibits the use of unfair or deceptive business practices in the conduct

of trade or commerce. The ICFA is to be liberally construed to effectuate its purposes. 815 ILCS 505/11a.

201.    Defendants are "person[s]" as defined by 815 ILCS § 505/1(c).

202.    Plaintiffs are "consumers" as defined by 815 ILCS § 505/1(c).

203.    Defendants engaged in deceptive trade practices in the conduct of their business, in violation of 815 ILCS §§ 510/2(a), by engaging in the acts and practices alleged herein.

204.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiffs.

205.    Defendants intended Plaintiffs to reply on their omissions and representations.

206.    The unfair and deceptive practices and acts by Defendant, including, but not limited to, bribing public officials to pass favorable legislation at the expense of Plaintiffs and Class members, were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Class members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

207.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and Class members suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from overpaying for electricity from Defendants'.

208.    Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorney's fees.

209.    Plaintiffs requests that this Court cause Defendants to disgorge this money to Plaintiff and all Class Members, enjoin Defendants from continuing to violate the ICFA as discussed herein, and award Plaintiff all monetary and non-monetary relief allowed by law,

including injunctive relief and reasonable attorney's fees. Plaintiffs, the Class, and members of the public will be harmed and/or denied an effective and complete remedy if such an order is not granted.

<h2 align="center">Count IV—Unjust Enrichment</h2>

210. Plaintiffs bring this count on behalf of themselves and the Class and repeat and re-allege all previous paragraphs as if fully included herein.

211. Plaintiffs conferred benefits on Defendants by purchasing their services at an inflated price.

212. Defendants have knowledge of such benefits.

213. Defendants have been unjustly enriched by retaining hundreds of millions of dollars of revenues in the form of inflated utility rates to the detriment of Plaintiffs and Class members.

214. Principles of justice, equity, and good conscience demand that Defendants not be allowed to retain these monies.

215. Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiffs and members of the Class is unjust and inequitable, and because equity and good conscience requires restitution, Defendants must pay restitution to Plaintiffs and members of the Class for its unjust enrichment, as ordered by the Court.

<h2 align="center">JURY DEMAND</h2>

Plaintiffs demand trial by jury on all claims.

<h2 align="center">PRAYER FOR RELIEF</h2>

Plaintiffs, individually and on behalf of the Class, respectfully pray for the following relief:

a. An order certifying the Class as defined above, appointing Plaintiffs as the representatives of the Class, and appointing their counsel as Class Counsel;

b. An award of all economic, monetary, actual, consequential, compensatory, and punitive damages available under the law, including trebling of economic injury;

c. An award of restitution and disgorgement;

d. An award of all equitable relief requested herein;

e. An award of reasonable litigation expenses and attorneys' fees;

f. An award of pre- and post-judgment interest, to the extent allowable; and

g. Such other further relief that the Court deems reasonable and just.

**August 3, 2020**                                       *Respectfully submitted,*

/s/ Jonathan D. Selbin                                   /s/ Laurel G. Bellows

Jonathan D. Selbin                                       Laurel G. Bellows, # 2454238
Rachel J. Geman                                          **The Bellows Law Group, P.C.**
Jason L. Lichtman, # 6290052                             209 South LaSalle, Suite 800
John T. Nicolaou                                         Chicago, IL 60604
**LIEFF, CABRASER, HEIMANN**                             312.332.3340
**& BERNSTEIN, LLP**                                     lbellows@bellowslaw.com
250 Hudson Street, 8th Floor
New York, NY 10013
212.355.9500

Kevin R. Budner                                          Gary M. Klinger, # 6303726
**LIEFF, CABRASER, HEIMANN**                             **Mason, Lietz & Klinger, LLP**
**& BERNSTEIN, LLP**                                     227 W. Monroe Street, Suite 2100
275 Battery Street                                       Chicago, IL 60606
San Francisco, CA 94111                                  202.975.0477
415.956.1000

Andrew R. Kaufman
**LIEFF, CABRASER, HEIMANN**
**& BERNSTEIN, LLP**
222 Second Avenue South, Suite 1640
Nashville, TN 37201
615.313.9000

*Attorneys for Plaintiffs and the Proposed Class*